DECIDED IN

# THE SUPREME COURT

OF THE

## STATE OF WASHINGTON.

[No. 3575. Decided August 20, 1900.]

W. D. WOOD et al., Respondents, v. CITY OF SEATTLE et al., Defendants, J. D. LOWMAN AND JACOB FURTH, Appellants.

DISMISSAL OF APPEAL—CESSATION OF CONTROVERSY.

Where it appears on the face of the records that the appellant had an appealable interest in the controversy at the time the judgment appealed from was entered against him, the appeal will not be dismissed because a contingency could happen which would determine the controversy, since the presumption is that appellant's interest continues until his rights are finally determined; and this presumption can be overcome only by an affirmative showing, appearing either upon the face of the record or by extrinsic evidence, that such interest has ceased to exist.

STREET RAILWAYS—FRANCHISES—EXTENSION OF.

An ordinance of the city of Seattle providing for the grant of a franchise to construct and operate lines of street railway upon various streets of the city and authorizing for that purpose the acquisition of any portion of street railway lines upon any of such streets, which lines so acquired shall be equivalent to new construction, and providing for the surrender of the franchises of any existing line, which may be acquired by the

grantees under the proposed franchise, does not constitute such an extension of existing franchises as to come within the inhibition of art. 4, § 20, of the city charter of Seattle, which provides that when any right, privilege or franchise has been granted and has been accepted, the city council shall not extend the time for which such right, privilege or franchise is granted until within three years of the expiration of the time for which such right, privilege or franchise is granted."

SAME—WHEN NOT EXCLUSIVE.

The city of Seattle has power to grant a franchise for a street railway along a street upon which there is a street railway operated under an existing franchise, when art. 4, § 22, of its charter provides that "no exclusive franchise or privilege shall be granted for the use of any street, alley or highway or other public place or any part thereof," and all ordinances granting franchises prior to the adoption of such charter provide that the franchises thereby granted shall not be deemed exclusive.

SAME—SURRENDER OF FRANCHISE.

Under art. 4, § 1, of the charter of the city òf Seattle, vesting all legislative power in the mayor and city council, and under art. 4, § 18, sub-div. 9, of said charter, empowering the city council "to authorize or prohibit the locating and constructing of any railroad or street railroad in any street, alley or public place of the city," and "to provide for the alteration, change of grade or removal thereof," the mayor and city council are vested with the absolute control of the city's interests in the franchises, and, in the absence of express provision in the charter forbidding it, are empowered to accept the surrender of any franchises by the owners thereof.

SAME—CONSOLIDATION OF EXISTING LINES—MONOPOLIES—CONSTITUTIONAL LAW.

An ordinance granting a franchise for the construction and operation of a system of street railways, which authorizes the grantees to acquire existing railway lines and surrender their franchises, for the purpose of operating a new system under the proposed franchise, does not violate art. 12, § 22, of the state constitution forbidding monopolies and trusts, by reason of the fact that portions of the existing lines in operation, and which may be absorbed under the proposed ordinance, are parallel and competing lines, which the grantees of the new franchise would thus be enabled to combine and consolidate.

ORDINANCES—PRESUMPTION IN FAVOR OF.

The presumption respecting ordinances passed by a municipal corporation is that all the provisions of such ordinances are within the powers of the charter which authorizes them, which presumption continues until the contrary is shown.

SAME.

If an ordinance be lawful upon its face,—that is, passed in due form of law and within the scope of the powers of the city council, — the courts will presume, in the absence of proof of fraud, that the ordinance is what it purports to be, and will determine its validity from its prescribed terms, rather than by inquiry into the motives of the members of the council and of its beneficiaries.

SAME—PUBLICATION—CONFORMITY TO PARTICULAR PROVISIONS UNDER GRANT OF POWERS.

Under the provisions of the charter of the city of Seattle empowering it to grant franchises for the construction of street railways; and under art. 4, § 23, of the charter, requiring notice of any application for such franchises to be published for ten days, offering to grant same to the person or corporation who will pay the highest percentage of gross receipts annually; and under art. 4, § 13, which provides that "no bill for the grant of any franchise shall be finally passed within thirty days after its introduction, nor until it has been published in the official newspaper of the city at the expense of the applicant for ten days daily," the general requisites applicable to the passage of ordinances must give way to the particular provisions which the charter makes applicable to ordinances granting franchises, and consequently the passage of such an ordinance is valid, although it has been published for the required number of days without containing the names of the actual grantees of the franchise nor the amount bid by them therefor.

GRANT OF FRANCHISE—PROVISIONS FOR COMPULSORY ARBITRATION—CONSTRUCTION.

A provision in a franchise for a street railway granted by the city of Seattle, to the effect that if any dispute shall at any time arise between the grantees or their successors and their employees, as to any matter of employment or wages, such dispute shall be submitted to arbitration, to which employers and employees shall be parties and entitled to be heard, and any award when made shall be binding and conclusive on all parties thereto for the period of one year from its date, is a sufficient compliance with the charter requirement (art. 4, § 23) which provides that

"it shall be the duty of the city council to incorporate in every such franchise    *    *    *    efficient provisions for the compulsory arbitration of all disputes arising between the grantee therein and his or its successors or assigns and his, its or their employees as to any matter of employment or wages."

Appeal from Superior Court, King County. — Hon. WILLIAM HICKMAN MOORE, Judge.    Reversed.

*Piles, Donworth & Howe* and *Preston, Carr & Gilman,* for appellants.

*Ballinger, Ronald & Battle* and *Allen & Allen,* for respondents.

The opinion of the court was delivered by

FULLERTON, J.—Article 4 of the charter of the city of Seattle contains, among others, the following provisions:

" Sec. 1.    All legislative power of the city of Seattle shall be vested in a mayor and a city council."

" Sec. 10.    Every legislative act of said city shall be by ordinance.    Every ordinance shall be clearly entitled and shall contain but one object, which shall be clearly expressed in its title.  .  .  ."

" Sec. 13.  .  .  .    No bill for the grant of any franchise shall be finally passed within thirty days after its introduction, nor until it has been published in the official newspaper of the city at the expense of the applicant for ten days daily."

" Sec. 18.    The city council shall have power by ordinance and not otherwise:  .·  .  .    Ninth.    To authorize or prohibit the locating and constructing of any railroad or street railroad in any street, alley or public place of the city, and to prescribe the terms and conditions upon which any such railroad or street railroad shall be located, operated or constructed; to provide for the alteration, change of grade or removal thereof; to regulate the moving and operation of railroad and street railroad trains, cars and locomotives within the corporate limits of the city; and to provide for, and it shall be the duty of the council by ordinance to provide for, the protection of all persons

and property against injury in the use of any such railroad or street railroad, or car thereof."

" Sec. 20. Every grant of a franchise, right or privilege, shall be subject to the right of the city council at any time thereafter to repeal, change or modify the said grant, if the franchise granted thereby is not operated in accordance with the provisions thereof or at all, and every ordinance making such grant shall contain a reservation of the right of the city council to so repeal, amend or modify said ordinance. When any right, privilege or franchise has been granted, and has been accepted, the city council shall not extend the time for which such right, privilege or franchise is granted until within three years of the expiration of the time for which such right, privilege or franchise is granted."

" Sec. 22. No exclusive franchise or privilege shall be granted for the use of any street, alley or highway or other public place or any part thereof.

" Sec. 23. The city council shall not grant authority to construct a street railway or lay down street railroad tracks upon or over any of the streets of said city, except in manner and on the terms following, that is to say: Upon the application being made to the city council for authority to construct and operate a street railway along and upon any of said streets, the city council shall, by resolution, determine whether such franchise, or any part thereof, shall be granted, and after such determination shall cause notice of such application and resolution to be published for ten days in the city official newspaper, at the expense of the applicant, and shall in such notice specify the route over and along which it proposes to grant such franchise, and shall offer to grant the same to the person, company or corporation who will pay for the franchise the highest percentage annually of gross receipts, but not less than two per cent. per annum. Bidding for such franchise must be in accordance with the provisions of this charter in relation to bids made to the board of public works, so far as such provisions may be applicable, and the city council may reject any and all bids, and may refuse to grant a franchise for any part of

the route for which the application was made. Each bid must be accompanied by a certified check, payable to the order of the city comptroller, for the sum of one thousand dollars, and the amount of the check shall be forfeited and paid to the city in case the successful bidder shall fail to accept the franchise, and upon acceptance the sum so paid shall be credited to the grantee on account of percentages. The same method of procedure shall obtain in case of the extension of such franchise or any existing franchises. It shall be the duty of the city council to incorporate in every such franchise or amended franchise efficient provisions for the compulsory arbitration of all disputes arising between the grantee therein and his or its successors or assigns, and his, its or their employees as to any matter of employment or wages, unless upon submission to the electors of the city, a majority of the electors voting upon the question submitted shall assent to the granting of such franchise without such provision."

It appears from the record that on April 24, 1899, the appellants made application to the city council for authority to construct and operate a street railway along and upon certain designated streets, alleys, and public places of the city of Seattle; that on May 1, 1899, a bill for an ordinance granting a franchise in accordance with the application, known as "Council Bill No. 595," was introduced in the city council, which remained pending before that body until January 18, 1900, during which time it was subjected to amendments as to its terms and conditions until a majority of the members of the city council were satisfied therewith. On the date last named the city council by resolution determined to grant the franchise. This resolution recited that application had been made for the granting of the franchise by the appellants; that a proposed ordinance granting a franchise had been introduced, and was ready for final passage, in favor of the person, company, or corporation who should be the highest bidder for such franchise, as soon as the publication

thereof could be made and bids received as required by the city charter; that the city council thereby determined to grant the franchise to the person, company, or corporation who would pay therefor the highest percentage of the gross annual receipts, not less than two per cent. thereof; the route over and along which the proposed franchise should be granted; the time in which bids therefor should be filed with the city comptroller; and directed that notice of the application for the proposed franchise, the determination of the city council to grant the same, and all other matters required by the city charter to be published in connection therewith, be published for ten days daily in the city official newspaper, and also that "the said council bill No. 595 shall also be published by the city comptroller in the city official newspaper at the expense of the said applicants for the same ten days daily, the said council bill containing the terms and conditions of the said franchise as proposed to be granted by the city council." The city comptroller complied with the command expressed in the resolution by publishing the required notice, in which he set forth at length the resolution as passed by the city council, and appended thereto the proposed bill or ordinance. The proposed ordinance, as published, is entitled as follows:

"An ordinance granting to J. D. Lowman and Jacob Furth, their successors and assigns, a franchise to construct, maintain and operate street railways in the city of Seattle."

In the first section of the ordinance J. D. Lowman and Jacob Furth, their successors and assigns, are named as the grantees of the proposed franchise. Elsewhere in the ordinance, where it became necessary to speak of the grantees, the words "the grantees" or "said grantees" are used; and in the clause fixing the amount of the gross

receipts required to be paid to the city a blank space was left, to be filled in when such amount should be determined. By the terms of the ordinance, the franchise to be granted thereby ceased and determined at 12 o'clock midnight December 31, 1934. The proposed ordinance does not describe one continuous route, but describes some twenty-two separate routes, numbered in the ordinance from 1 to 22, inclusive. A portion of these routes is covered by existing street railways, operated under some seven different franchises. Of these, six were granted prior to the adoption of the present city charter, and one afterwards. The franchises of the first six mentioned expire by their own limitations between the years 1913 and 1917, and the seventh one in the year 1944. In each it is expressly provided that it shall not be deemed exclusive. Section 3 of the proposed ordinance prescribes minutely the time within which a street railway shall be constructed and in operation over the several routes and parts of routes described therein, with the method and manner of such construction, and contains the following clause:

" The several parts of the system of railways hereby authorized shall be completed, and the operation thereof under this franchise be begun in good faith within the respective times stated in this section, unless prevented by accident, act of God, strikes, act of the city, inability to obtain material, or legal proceedings in court: provided that the acquisition by purchase or otherwise by the grantees, their successors or assigns, of any existing railway or railways, or any parts thereof, on any of the said routes or parts of routes, and the bringing of the same under the operation of this franchise, shall be equivalent to new construction and completion to the extent so acquired, and to the extent that the same shall be made to conform in material and construction with the requirements of this ordinance. Unless prevented, as aforesaid, the grantees, their successors or assigns, shall within thirty days from their acceptance of this franchise, begin in

good faith the construction of said system of railways, or some part thereof, or acquire a railway or some part thereof, as a part of the system hereby authorized. In case any existing railway is acquired and used as a part of the system hereby authorized, the operation of so much thereof as is embraced in any of the routes hereinbefore described, shall be continued with only so much interruption as is actually necessary to make the same conform with the provisions of this ordinance."

The ordinance also contains the following sections:

" Sec. 8. That if any dispute shall at any time arise between the said grantees, their successors or assigns, and their employees, as to any matter of employment or wages, such dispute shall be submitted to arbitration. The grantees, their successors and assigns, and their employees, shall be parties to any submission, and shall be entitled to be heard by the arbitrators, and any award when made shall be binding and conclusive for the period of one year from its date, upon the grantees, their successors and assigns, and upon their employees."

" Sec. 11. In case the grantees, their successors or assigns, shall acquire and use, as a part of the system of railways to be maintained and operated under the franchise hereby granted, any existing railway or railways, or part or parts thereof, then said grantees, their successors or assigns, shall, within six months after the date on which this ordinance goes into effect, or (in case the same be so acquired after the expiration of said six months and within the time hereby limited for completing said railways) then within thirty days after the time of acquiring any such existing railway or part thereof, file in the office of the city comptroller, a release or releases, executed by the proper owners and running to the city of Seattle, releasing all rights, privileges and franchises, heretofore granted by the city of Seattle, under which such existing railway or railways, so acquired, are now being operated, whether such former franchise is wholly or only in part upon any of the routes or parts of routes on which a franchise is hereby granted. In case within the time herein limited for filing any release or releases, the filing of such

release or releases or the construction or operation of the
system of street railways hereby authorized or any part
thereof on any of the routes herein set forth shall be re-
strained or interfered with by any injunction or other
process of court, then the time for filing the releases afore-
said shall be thereby extended until thirty days after the
final determination of such suit or suits: provided, said
grantees, their successors or assigns, shall in good faith
expedite the trial of any such suit with due diligence."

This action was begun on the day fixed by the city coun-
cil for receiving bids for the franchise proposed to be
granted by the ordinance above described. The plaintiffs
sue as taxpayers. They allege no private or special inter-
est other than such as all the taxpayers of the municipality
have in the subject-matter of the controversy. They made
defendants the city of Seattle, its mayor, the thirteen
members of the city council, and the appellants, Lowman
and Furth. The complaint is sweeping in its allegations.
Briefly stated, it sets out the provisions of the city charter
above cited; the existence of the several franchises under
which the present systems of railways in the city of Se-
attle are being operated; that the appellants and other per-
sons unknown to the complainants have acquired the control
of all the existing rights and privileges granted by the ordi-
nances creating such franchises; recites the proceedings
had by the city council with reference to the proposed ordi-
nance up to the time of the filing of the complaint, and,
prefixed by adjectives appropriate to plaintiffs' view of the
matter, charges that such proceedings were had as the
result of a conspiracy entered into between Lowman and
Furth and the city of Seattle, its mayor and city council,
to "secure to said J. D. Lowman and Jacob Furth and
said other persons, their successors and assigns, the sole,
absolute, and exclusive franchise, right, privilege, and
monopoly of the street-car system or systems, and of all

the street-car business to be carried on and transacted in
the city of Seattle for a period of thirty-five years;" that
the proposed ordinance, contrary to the provisions of the
city charter, extends the time of the existing franchises,
in that it provides that the acquisition of existing rail-
ways shall be equivalent to new construction; that it pre-
vents competition in bidding, and practically bars any
and all persons other than Lowman and Furth from be-
coming bidders; that it fails to make efficient provision
for compulsory arbitration; and that the procedure
adopted by the council for the passage of the ordinance is
not in accordance with the requirements of the city char-
ter. The prayer is for injunctive relief. The answers of
the defendants put in issue the traversable allegations of
the complaint, and plead affirmatively that the procedure
followed by the council with respect to the application
of the appellants for a street-railway franchise is the
course of procedure that has been followed by the city
council with respect to all other applications for street-
railway franchises, and council bills and ordinances grant-
ing the same, since the adoption of the present city char-
ter. The reply is a denial of the affirmative matter of the
answer. At the conclusion of the hearing of the applica-
tion for a temporary injunction the trial court refused to
grant a temporary injunction against the defendant city,
its mayor or city council, but enjoined the appellants,
Lowman and Furth, "from making any assignment of
any of the rights, privileges, and franchises evidenced by
council bill No. 595, mentioned in the complaint herein,
or the ordinance based thereon, if enacted by the city
council of said city, or any other ordinance of similar
import hereafter enacted, or from laying down, maintain-
ing, or operating any tracks or street-railway line under
or by virtue of said council bill or proposed ordinance,

and from doing any act or thing whatever under or by virtue of said council bill or proposed ordinance, or any other ordinance of similar import hereafter enacted," until the further order of the court, except that they may, on certain conditions, file an acceptance of the grant of the franchise in case it should be granted to them.    This appeal is from that order.

The respondents move to dismiss the appeal, assigning as a reason therefor that it does not appear that the appellants have any interest in the subject-matter of the controversy.    They argue that inasmuch as the court refused to enjoin the city from receiving bids, and accepting the highest and best bid, or from passing the ordinance, and as it was shown at the hearing that there were bids put in for the franchise, other than that of the appellants, it will not be presumed that the appellants were the highest or the successful bidders, or that they have now any interest in the controversy, but that an affirmative showing to that effect must be made.    The cases of *State ex rel. Coiner v. Wickersham,* 16 Wash. 161 (47 Pac. 421), and *State ex rel. Daniels v. Prosser,* 16 Wash. 608 (48 Pac. 262), are cited in support of the motion.    These cases lay down the rule that where it appears affirmatively by the record, or it is made so to appear by a showing outside of the record, that the matters in controversy between the parties, or the rights originally involved in the action, have ceased to exist, this court will dismiss the appeal, even though it may leave the question as to which party is entitled to costs undetermined.    Further than this the cases do not go.    They are not authority for the proposition that the court will dismiss an appeal because a contingency could happen which would determine the controversy, without a showing that such contingency has actually happened.    The rule is the other way.    Where it ap-

pears on the face of the record that the appellant had an appealable interest in the controversy at the time the judgment appealed from was entered against him, the presumption is that this interest continues until his rights are finally determined, and is overcome before that time only by an affirmative showing, appearing either upon the face of the record, or by extrinsic evidence, that such interest has ceased to exist. As nothing appears in the present record to that effect, the motion to dismiss will be denied.

On the merits of the controversy the argument of counsel has taken a wide range, and many questions are discussed which we think are immaterial to a decision of the case presented. We will notice only those suggested by respondents as reasons for an affirmance of the judgment. The principal contention is that the proposed ordinance has the effect of extending the time of certain of the street-railway franchises now existing in the city of Seattle, and is thus in violation of § 20 of article 4 of the city charter, above quoted. The learned counsel for the respondents take the position—at least, we are able to draw no other conclusion from the argument,—that it matters not whether the ordinance granting the new franchise contains conditions totally at variance with the conditions of the ordinances granting the existing franchises, or whether the franchise be granted to the persons owning the existing franchises, or put up at auction and sold to the highest bidder, or whether the ordinance provides for an entire system of street railways, which may be constructed without reference to any existing system, it is nevertheless, in effect, but an extension of the time of the existing franchises, so long as it permits the tangible property of the street-railway systems now being operated under existing franchises to be used in the new system of street railways

to be operated under the new franchise. Speaking of the proposed ordinance, they say (we quote from the brief):

"The ordinance, by its terms, provides that the acquisition of any portion of existing street railways shall be equivalent to new construction, and further provides for the filing of releases of existing franchises, and this to the end that the old franchises would, of necessity, and *ipso facto,* be extended under the new franchise. We repeat, the test of the validity of the proposed ordinance 595 is not what the grantees *might or might not do* thereunder, but what they are given the *right* to do thereunder. The ordinance, by providing for the acquisition of existing franchises, and bringing the street railways under the operation of the proposed franchise, has the effect of bringing the same under the *provisions* of the proposed franchise, and thereby, of necessity, extending the *period of the existence* of the old franchises."

Again:

"If the proposed ordinance is not a violation of said section 20 of the city charter, then appellants can, five years hence, again do that which they are now seeking to have done, viz., apply to the city council for a franchise covering the same routes embraced in the proposed franchise, and adding thereto additional routes and provisions, either important or unimportant, and ask the passage of an ordinance similar to ordinance 595 for a period of forty or fifty years; and, if their contention in this case is correct, then it is also correct to say that, should it, by the proposed ordinance, for forty or fifty years, be provided that the acquisition by purchase of any existing street railway and the surrender of existing franchises to the city be made, that such proposed franchise of forty or fifty years, covering almost, if not in its entirety, the provisions of ordinance 595, would not be in violation of section 20 of the city charter. This process could be repeated from time to time, *ad infinitum,* and never would the contingency happen of any street-railway franchise getting within *three* years of its expiration. We respect-

fully submit that the very statement of the proposition carries its own refutation." (The italics are counsel's.)

This reasoning, it seems to us, not only assumes that the tangible property used in the operation of the railway system, and the right by which it is operated on the streets of the municipality,—the franchise,—are one and the same thing, but it assumes that the city of Seattle is without power either to grant a new franchise for a street railway along a street upon which there is an existing railway operated under an existing franchise, or to accept or permit a voluntary surrender of an existing franchise. It ought not to require argument to prove that the franchise under which a street railway is operated is separate and distinct from the tangible property used in the operation of that railway. The franchise, while it is property, is in its nature but a permit to use the streets of the municipality in a particular way for a particular purpose. The tangible property—the railway tracks, the cars, and other equipments—is but a part of the means necessary to a successful operation of the railway system, and can no more be a part of the franchise under which the system is being operated than can the labor of the individuals who control and direct its operation. Neither does the city, by the mere grant of a franchise for the operation of a street railway upon its streets, become the owner of the tangible property used in the operation of that railway. Nor, unless the ordinance granting the franchise so expressly provides, can it become such owner by the forfeiture or termination by limitation of the franchise. As none of the ordinances granting the franchises which the proposed ordinance permits to be surrendered contain such a provision, the tangible property of the railway systems, if such surrender be made, will continue to be the property of its then owners. This being true, there can

be no more reason for saying that the continued use of this tangible property is the continued use of the franchise, than there can be for saying that the use of any other property of like kind would have that effect. Only upon the theory that the tangible property of the railway system and the franchise under which it is being operated are one and the same thing, can it be said that the continued use of the one is the continued use of the other. We think counsel have attached undue importance to this provision of the proposed ordinance. Had it not been provided that the existing railways, on the surrender of the franchises under which they are being operated, shall be deemed new construction, to the extent that they shall be made to conform to the requirements of the proposed ordinance, this would have been the effect of the ordinance in any event. Without this provision, all the city could have required would have been a street railway constructed in accordance with the requirements of the ordinance. It reserved no right to dictate from whom the material used in the construction of the railway should be purchased, nor what particular material should be used in that construction. These matters were left to the discretion of the purchasers of the franchise. If, then, they purchased a railway track which complied with the terms of the ordinance, on what theory could the city have prohibited its use? Must the idle ceremony of tearing it up and relaying it be gone through with? It would seem not; and much less would it seem that the grant of a franchise accompanied by permission to do a particular thing, which the grantee may lawfully do without such permission, would change the nature of the grant.

The assumption that the city has not power to grant a franchise for a street railway along a street upon which there is an existing street railway operated under an exist-

ing franchise, or to accept the voluntary surrender of an existing franchise, is equally without foundation. As we have shown, the present city charter expressly provides that no exclusive franchise or privilege for the use of any street shall be granted; and the ordinances granting the franchises which were in existence at the time of the adoption of the present city charter, and which may be affected by the proposed ordinance, all contain provisions to the effect that the franchise thereby granted shall not be deemed exclusive. To the objection that the provisions of the charter under which these franchises were granted control on this question, and that this charter is not before us, it is a sufficient answer to say that the presumption is that all the provisions of the ordinances are within the powers of the charter which authorized them, and that this presumption continues until the contrary is shown. The second proposition seems equally free from doubt. By the charter of the city of Seattle, all legislative power is vested in the mayor and city council. In addition to this general power, by the ninth subdivision of § 18 of article 4 the city council is given power "to authorize or prohibit the locating and constructing of any railroad or street railroad in any street, alley or public place of the city," and "to provide for the alteration, change of grade or removal thereof." While it may be doubted whether this grant of powers would authorize the city council, against the consent of the owners of an existing franchise, operating a street railway thereunder, to compel the removal of the railway and a surrender of the franchise, so long as such owners were operating it in accordance with the terms of the ordinance under which the franchise was granted, yet it is ample to vest in the city council the absolute control of the city's interests in the franchises, and make the mayor and city council the sole representative

2—23 WASH.

of the public interest involved.    Stated in another way,
the general public of the city can have no such interest in
the maintenance of a street railway or the existence of a
franchise as to prevent the removal of the one or the sur-
render of the other against the will of the legislative
authority of the city.    And, as there is no express pro-
vision in the charter which forbids the exercise of this
power, there is no reason why these franchises may not
be surrendered by the mutual consent of the city council
and the owners of the franchises.

Counsel have laid much stress upon the facts that the
names of the appellants are inserted in the title and body
of the proposed ordinance; that the appellants have al-
ready acquired certain of the existing franchises, and a
controlling interest in certain of the others; and that they
testified that they intended, did they become the pur-
chasers of the new franchise, to procure all of the out-
standing franchises, surrender them to the city, and oper-
ate the existing railway systems, so far as it was permis-
sible so to do, as one system, under the new franchise, all
of which, they argue, is inconsistent with the idea that a
new and independent franchise was intended to be granted.
But if the courts were permitted to determine the validity
of an ordinance because of the motives of the city council
which passed it, or of the motives of those who may expect
to prove its beneficiaries, the facts recited are no more
inconsistent with the conclusion that the purpose of the
city council in passing the present ordinance was to grant
a new and independent franchise, than it is with the con-
clusion that their purpose was to extend the time of those
now existing.    The courts, however, will not generally de-
termine the validity of an ordinance by inquiries of this
kind.    If an ordinance be lawful upon its face,—if it be
passed in due form of law, and be within the scope of the

powers of the council,—the courts will usually presume it
to be what upon its face it purports to be, and determine
its validity from its prescribed terms, rather than by insti-
tuting an inquiry into the motives of the members of the
council which passed it, or into the motives of those who
prove its beneficiaries.   Indeed, if the power to declare
an ordinance which is valid upon its face invalid, because
of the motives of the members of the council who voted
for it, rests with the courts at all, it does so only in those
cases where actual fraud is shown.   And of fraud on the
part of the city council there is nothing in the present
record.   True, conspiracy and fraud are alleged in the
complaint, but no evidence was tendered to support these
allegations, while, on the other hand, conspiracy and fraud
are emphatically denied, both in the answers filed, and in
the affidavits used at the hearing.   Laying aside all ulte-
rior inquiries, and considering the ordinance solely with
reference to the terms of the charter, it is clear that it
cannot be held to extend the time of any of the existing
franchises.   Of this there can be rationally no two
opinions.   To extend the time of a franchise is to give
one which presently exists a longer time to operate in than
that to which it was originally limited.   It is to continue
it in the hands of its then owners, without change in its
terms or conditions, for a longer period than that for
which it would otherwise continue.   The proposed ordi-
nance does not do this.   On the contrary, it provides for
the surrender and termination of existing franchises.   Un-
less words have lost their meaning, to surrender and ter-
minate a franchise cannot be an extension of the time of
that franchise.   If, however, it be conceded that the grant
of a new franchise to the holders of an existing one would,
under the charter provision in question, be held to be but
an extension of the time of the existing franchise in a case

where the new franchise extended for a longer period of time than the old, and their terms and conditions did not materially differ, such concession would not aid the respondents here, as no question of that kind is presented by the present record. The city council do not propose to grant a new franchise to the owners of the existing franchises, but to the person or persons who will pay the most for it. It is to be granted upon terms materially and essentially different from the terms of any of the existing franchises. Under the ordinance providing for it, a system of street railways may be constructed without reference to or interference with any of the existing systems of railways. In fine, unless it be held that the grant of any new franchise for a street railway along a street upon which there is an existing railway operated under an existing franchise would be an extension of the time of the existing franchise, if the period of existence of the new should happen to be longer than the old, there can be no reason for holding that the intended grant will extend t' time of the existing franchises.

It is next said that the proposed ordinance, when considered in connection with the acquisition of the existing street-railway lines, creates a "monopoly and trust," and is therefore in violation of § 22 of article 12 of the state constitution. That section is as follows:

"Monopolies and trusts shall never be allowed in this state, and no incorporated company, copartnership, or association of persons in this state shall directly or indirectly combine or make any contract with any other incorporated company, foreign or domestic, through their stockholders, or the trustees or assignees of such stockholders, or with any copartnership or association of persons, or in any manner whatever, for the purpose of fixing the price or limiting the production or regulating the transportation of any product or commodity. The legislature shall pass laws for the enforcement of this section

by adequate penalties, and in case of incorporated companies, if necessary for that purpose, may declare a forfeiture of their franchise."

The argument is that portions of the lines now in operation, and which may be absorbed by the proposed ordinance, are parallel and competing lines, and because of this provision the city is without power to pass an ordinance under which they may be combined or consolidated. Whether the proposed ordinance will have the effect of consolidating competing lines does not very clearly appear from the record, but, assuming that it will, we cannot think that this section of the constitution was intended to be a limitation upon the legislative power to authorize such a consolidation whenever it may deem the public interests demand it. The prohibition is directed against combinations between corporations, companies, or individuals, made "for the purpose of fixing the price or limiting the production or regulating the transportation of any product or commodity," and it is combinations of this character and for these purposes that constitute the monopolies and trusts which the constitution interdicts. Elsewhere in the constitution ample power is given the legislature to correct and prevent abuses such as the respondents contemplate, by fixing maximum rates and charges for the transportation of passengers and freight; and it was from this power that the constitution makers intended that relief should be found from (to quote from that instrument) "discrimination and extortion in the rates of freight and passenger tariffs," rather than from the fancied relief to be obtained from competing lines.

In the statement we have outlined the procedure followed by the city council leading up to the passage of the proposed ordinance. It is evident therefrom that the ordinance as published may not contain the names of the

actual grantees of the franchise, and does not, and from the nature of the proceedings could not, recite the amount bid for the franchise. This, it is said, is not a publication of the ordinance, within the meaning of the charter, and should the council pass it, amended in these particulars, without further publication, as the record shows they purpose doing, the ordinance can have no validity. It is a general rule, applicable at least to municipal corporations, that, where the mode of enacting ordinances is prescribed by the charter, it is essential to the validity of an ordinance that the mode prescribed be pursued. When the charter prescribes in detail this mode, there cannot usually be any difficulty in the application of the rule; but where, as in the present charter, general requisites applicable to all ordinances are stated, followed by particular provisions applicable to a particular ordinance, it may sometimes become a matter of some difficulty to make the particular provisions harmonize with all of the general requisites. The present case presents a difficulty of that kind. To evidence this, it needs only to be cited the plan suggested by the respondents' counsel. While their plan would undoubtedly obviate the objection made to the one pursued by the city council, yet in order to maintain it they were forced to take the position that the word "applicant," as used in the clause requiring the expense of the publication of the ordinance to be borne by the applicant for the franchise, means the successful bidder at the sale of the franchise. Obviously any procedure which requires this construction of the language of the charter cannot be entirely free from criticism. But it has never been held that a city council is prohibited from exercising a grant of power merely because it cannot comply strictly with all of the general requirements which the charter has hedged about the procedure prescribed for the exercise of the power. In

such cases the procedure must give way to the grant, and
a substantial compliance is all that can be expected or re-
quired.   The question here is, then, did the city council
substantially comply, by the procedure adopted, with the
requirements of the charter ?   We think the question must
be answered in the affirmative.   The purpose and intent
of requiring the resolution of the council and the ordi-
nance to be published is twofold, namely, to inform the
general public of the contemplated action of the city
council, and thus give an opportunity to protest against
and prevent hasty and ill-advised grants, and to give to
prospective bidders notice of the sale of the franchise.  The
insertion of the names of the actual grantees of the fran-
chise, or the amount bid for the franchise, in the ordi-
nance, prior to its publication, would neither further nor
retard these objects, and we cannot think that such an
omission is so far a departure from a correct procedure as
to compel a holding that the ordinance is invalid.

The objections, suggested in the complaint, to the effect
that the ordinance prevents competition in bidding at the
sale of the franchise, and fails to make efficient provision
for the compulsory arbitration of all disputes arising be-
tween the grantees of the franchise and their employees
as to any matter of employment or wages, are not argued
in the brief of respondents' counsel, and were only inci-
dentally touched upon in the oral argument at the bar.
The first of these objections is, we think, so entirely with-
out merit that it may be passed without comment.   As to
the second, we will discuss it but briefly.   It will be noticed
that the language of the charter is that the city council,
upon the grant of a franchise, shall incorporate therein
"efficient provisions for the compulsory arbitration of all
disputes" arising between the grantees of the franchise
and its employees "as to any matter of employment or

wages," while the ordinance does no more than make it imperative that any dispute of this character shall be submitted to arbitration. The query naturally arises whether this is an "efficient provision" for compulsory arbitration, within the meaning of these words as they are used in the charter. "Arbitration" is defined by Bouvier as the "investigation and determination of a matter or matters of difference between contending parties, by one or more unofficial persons chosen by the parties;" and "compulsory arbitration is that which takes place when the consent of one of the parties is enforced by statutory provisions." Taking these definitions as being correct, it would seem that the city council had done practically all that they were warranted in doing under the power given them by the charter. This provision of the ordinance is, like all others of its provisions, one of the conditions upon which the franchise is granted; that is to say, it is a part of the contract between the city and the grantees of the franchise. To enforce its performance, or to recover for a breach in its performance, the city must resort to that means which it has to enforce or recover for a breach in the performance of any other part of the contract. The charter does not give the city power to create a board or court of arbitration, and compel the employees of the grantees of the franchise to submit their side of any controversy which may arise between them and their employees to its judgment, nor does it give the city power to prescribe a mode of procedure which would be binding upon such employees. In short, the city council can only make rules for the grantees of the franchise in relation to this subject, and is without power to make any rule looking to a settlement of disputes between its grantees and their employees which the employees are bound to accept. It would seem then that had the city council

undertaken to appoint a court or board of arbitration, and prescribe a procedure for its guidance, such provision would tend rather to narrow and render the general provision inefficient than to make it more efficient. As the contract now stands, the grantees are bound, under the penalty of a forfeiture of their franchise, should the contemplated difficulty arise, to submit their side of the controversy to a board of arbitrators selected in any manner that will secure competent, just, and impartial triors, and try their differences by any mode of procedure that will give them a full and fair hearing, and an opportunity to present their side of the case But had the city council provided for the appointment of a court or board of arbitration, and prescribed for it a mode of procedure, and made a trial before that court or board, and by that method, exclusive, it would be a compliance with the terms of the contract on the part of the grantees to be ready to submit the differences to the determination of that court or board, to be tried in the prescribed way, however inadequate might be the remedy to afford relief in the particular case, while, if it was not made exclusive, it would be advisory, merely, and no more efficient than the general provision which the ordinance now contains.

No other ground having been suggested upon which the order of the trial court can be sustained, and as we have discovered no other in the record, the order appealed from is therefore reversed, and the cause remanded, with instructions to discharge the temporary injunction.

REAVIS and ANDERS, JJ., concur.